IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| SOUTHERN MILLS, INC. d/b/a TENCATE PROTECTIVE FABRICS, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action File No. |
| v. | ) ) ) | |
| H. JAMES NUNES, | ) ) ) | |
| Defendant. | ) | |

## COMPLAINT FOR RICO VIOLATIONS, FRAUD AND RELATED CLAIMS

Plaintiff, Southern Mills Inc. d/b/a TenCate Protective Fabrics ("Southern Mills"), for its Complaint against Defendant, H. James Nunes ("Nunes"), respectfully shows the Court as follows:

### PARTIES, JURISDICTION AND VENUE

1.      Southern Mills is a Georgia corporation with its principal place of business located in Union City, Fulton County, Georgia.

2.      Nunes is a citizen of the State of Maryland.  Nunes is subject to the personal jurisdiction of this Court under the Georgia long-arm statute, O.C.G.A. § 9-10-91, and under 18 U.S.C. § 1965(a).

US2008 1648470.6

3.     Subject matter jurisdiction is proper under 28 U.S.C. § 1331 (federal question jurisdiction) and 18 U.S.C. § 1965(a).  Subject matter jurisdiction is also proper under 28 U.S.C. § 1332 (diversity jurisdiction), because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

4.     Venue in this action is proper in the Northern District of Georgia under 28 U.S.C. § 1391(a) because, among other reasons, a substantial part of the events giving rise to Southern Mills' claims occurred in this judicial district. Venue is also proper here under 18 U.S.C. § 1965(a).

## STATEMENT OF FACTS

5.     Southern Mills is in the business of developing, manufacturing, and selling flame resistant fabrics for military, fire service, and other uses.

6.     This dispute arises from a series of communications and agreements between 2006 and the fall of 2009, involving Southern Mills and Nunes.

### Nunes' False Representations About the Corporate Entities With Which Southern Mills was Contracting

7.     Nunes purported to act as the Chief Executive Officer ("CEO") of various corporations directly or indirectly owned or affiliated with Sitnasuak Native Corporation ("SNC"), a corporation headquartered in Nome, Alaska, and

-2-

US2008 1648470.6

formed as an Alaska Native Corporation under the provisions of the Alaska Native Claims Settlements Act, 43 U.S.C. §§ 1601-1642.

8.     Southern Mills entered into various agreements believing it was dealing with companies wholly or partly owned by SNC, including SNC Telecommunications, LLC ("SNCT"), a wholly-owned subsidiary of SNC and a major buyer of flame resistant fabrics from Southern Mills.

9.     Nunes acted as the CEO of SNCT and represented to Southern Mills that another company named Insight Holding Group, LLC ("Insight Holding") – another entity for which Nunes acted as the CEO – was also partly owned by SNC and was related to SNCT.

10.     Southern Mills had no reason to know or suspect that Nunes was misrepresenting the true internal structure of SNC and SNCT and their affiliated and related companies.  In fact, as set forth below, Nunes had misstated or failed to disclose the true inter-corporate relationships of the various companies, for the purpose of concealing the fact that Insight Holding was secretly wholly-owned by Nunes.

11.     In reliance on Nunes' representations regarding the relationship among the various companies with which Southern Mills was contracting, Southern Mills was led to believe that it was dealing at all times with a family of

-3-

companies that were all either affiliated with or related by stock ownership to SNC.

12. As a result of these misrepresentations, Southern Mills permitted Nunes to direct which "SNC" company would serve as the counterparty to various agreements reached with Southern Mills. In fact, Nunes directed Southern Mills to enter into various contracts with Insight Holding, which Nunes had led Southern Mills to believe was partly-owned by and related to SNC. The use of Insight Holding as a contracting counterparty was an essential aspect of Nunes' overarching scheme to defraud.

13. Nunes made various specific misrepresentations in furtherance of this scheme to defraud. Nunes led Southern Mills to believe that SNC owned 49% of Insight Holding, and that certain of the agreements at issue (as detailed below), providing for substantial payments by Southern Mills, were to be placed in the name of Insight Holding instead of SNCT and structured as commission payments, because SNCT purportedly could not benefit directly from those payments due to certain limitations on SNCT, resulting from its status as a company obtaining governmental preferences under Section 8(a) of the Small Business Act.

14. Southern Mills believed, therefore, that it could only provide a benefit of these payments to its major customer (SNCT) by contracting with another albeit

-4-

related entity, Insight Holding. Southern Mills was also convinced that, through these payments, Southern Mills would obtain the benefit of maintaining and enhancing its ties to its customer, SNCT, by virtue of obtaining the ongoing assistance of SNCT, a major supplier to the U.S. military, in promoting and selling products using Southern Mills fabrics.

15. Southern Mills learned in late September 2009, however, that Insight Holding is and at all times has been wholly-owned by Nunes and is not related to SNC or SNCT.

16. As a direct result of this fraud, Southern Mills ended up paying substantial commissions for sales of flame resistant fabrics to what it now understands was an "independent consultant" with no purchasing power – Insight Holding – instead of for the benefit of a large and valuable manufacturing customer (SNCT) with extensive sales relationships with the U.S. military.

17. SNC and SNCT ultimately discovered this ruse by Nunes, terminating their relationship with him and bringing suit against him for breach of fiduciary duty, diversion of funds, making false statements to the Small Business Administration, and other unlawful acts.

US2008 1648470.6

18.    Upon learning the true facts, Southern Mills promptly rescinded the contracts with Insight Holding that Southern Mills entered into based on Nunes' fraudulent and deceptive statements and conduct.

### The SNC Companies, Insight Holding and Nunes

19.    SNCT is in the business of manufacturing apparel primarily for the use of military personnel.  During the relevant time period, SNCT maintained business addresses at, among other locations, 6927 Old Seward Highway, Suite 203, Anchorage, Alaska  99518; P.O. Box 905, Nome, Alaska  99762; and 1000 Potomac Street, NW, Washington, DC  20007.

20.    Nunes is the sole member, manager, and owner of Insight Holding and initially was the sole member, manager, and owner of another entity with a similar name, Insight Consulting Group, LLC ("Insight Consulting").  During the relevant time period, Insight Consulting maintained business addresses at, among other locations, Sunrise Valley Drive, Suite 100, Reston, Virginia  20191; and 5304 Boxwood Court, Bethesda, Maryland  20816.

21.    As detailed below, SNCT entered into several contracts with Insight Consulting and Insight Holding for a wide array of management services.

22.    Southern Mills did not become aware of the true facts concerning the relationships between the SNC companies, the "Insight" companies, and Nunes,

-6-

including the details of the agreements between those parties, until after SNC and SNCT initiated an investigation into Nunes' conduct in May 2009.

23. On June 14, 2002, SNCT and Insight Consulting entered into an agreement ("the 2002 Agreement"), attached hereto as Exhibit 1, whereby Insight Consulting, acting through Nunes, was to "serve as a business consultant and 'Bonafide Sales Representative,'" and, in exchange, was to receive a 3% "success fee" on SNCT's gross sales of apparel items.

24. In or around September 2004, Nunes began in fact to function as the CEO of SNCT.

25. On January 1, 2006, SNCT and Insight Consulting entered into another agreement ("2006 Agreement"), attached hereto as Exhibit 2, whereby Insight Consulting, through Nunes, agreed to provide "CEO services" to SNCT. Pursuant to the 2006 Agreement, Insight Consulting agreed to provide:

US2008 1648470.6

> CEO services to SNC Manufacturing/SNCT and perform all duties customarily performed by a company's Chief Executive Officer during the term of this Agreement, and shall devote its attention, energy, and best efforts in providing CEO services for SNCT, including oversight of strategic planning, business planning, production management, business reports, quality assurance, contract administration, marketing and sales functions, finance and accounting functions, employee and key management recruiting and supervision, and such other oversight services as reasonably requested by SNCT.  It is agreed that at all times that this agreement is in effect, ICG shall have complete control of all SNCT's day to day business operations.

Exhibit 2 at 1.

26.     Both prior to and following the execution of the 2006 Agreement, Nunes, in fact, acted as SNCT's CEO.  In that role, he was responsible for performing the duties customarily performed by a CEO, including, but not limited to, the management of the day-to-day affairs of SNCT and the active solicitation and participation in obtaining contracts from the U.S. Government for SNCT.

27.     Southern Mills states, on information and belief, that SNC acquired a 51% interest in Insight Consulting in late 2006 or early 2007.

28.     On January 4, 2007, shortly after transferring 51% of Insight Consulting to SNC, Nunes formed another "Insight" entity – Insight Holding, a company wholly-owned by him.  During the relevant time period, Insight Holding

maintained business addresses at, among other locations, 5304 Boxwood Court, Bethesda, Maryland  20816; and 1101 30th Street, NW, Suite 330, Washington, DC 20007.

29.    Southern Mills states, on information and belief, that Nunes caused SNCT to pay the legal fees incurred to form Insight Holding in Delaware.  This enabled Nunes to acquire an interest in Insight Holding.  Southern Mills further states, on information and belief, that Nunes caused the United States mails to be used to form Insight Holding.

30.    On the same day that Insight Holding was formed, SNC, SNCT, Insight Consulting, and Insight Holding entered into an Assignment, Assumption, and Adoption Agreement ("Assignment Agreement"), under which Insight Consulting assigned all of its rights and responsibilities under the 2002 Agreement to Insight Holding, and Insight Holding agreed to assume and fulfill all of Insight Consulting's "obligations, covenants, representations, conditions, and promises" under that agreement.  It appears that the Assignment Agreement also assigned Insight Consulting's rights and responsibilities under the 2006 Agreement as well, although the Assignment Agreement refers to a December 1, 2005 "Amendment" to the 2002 Agreement.  The Assignment Agreement is attached hereto as Exhibit 3.

-9-

31.    Nunes executed the Assignment Agreement on behalf of both Insight Consulting and Insight Holding, as the "CEO" of those respective companies.

32.    In October, 2008, Insight Holding signed an agreement with "SNC, LLC" (an entity that does not technically exist) ("2008 Agreement"), attached hereto as Exhibit 4, which stated that Insight Holding would provide "independent Consulting Services to SNC and other SNC Companies providing services directly or indirectly to the US Government."  Similar to the 2006 Agreement with Insight Consulting, these services to be provided by Insight Holding were to include "oversight of strategic planning, business planning, production management, quality assurance, contract administration, marketing and sales, finance and accounting functions, employee and key management recruiting and supervision, and such other oversight services as reasonably requested by SNC."

33.    Both prior to and following the execution of the 2008 Agreement, Nunes, acting on behalf of Insight Holding, served as CEO of SNCT.  In that role Nunes performed the duties customarily associated with the responsibilities of a CEO, as described above.

34.    Various corporate documents, including, but not limited to, the organization chart for the "SNC Companies PR Operations" (attached hereto as

-10-

Exhibit 5), identified Nunes as the CEO of SNC's apparel manufacturing companies.

35.   For the purpose of maintaining control over SNCT, Nunes made affirmative misrepresentations to the Small Business Administration on several occasions.

36.   Specifically, Nunes filed false written certifications on SBA Forms 1790 to the effect that, during the periods from January 1, 2006 to June 30, 2006, and from July 1, 2006 to December 31, 2006, SNCT had used no representatives and had paid no compensation for services in connection with obtaining federal contracts.  In fact, SNCT had used representatives (Insight Holding and Nunes) and had paid compensation for services in connection with obtaining federal contracts.  On numerous other occasions, Nunes, acting as CEO of SNCT, caused or allowed others to make similar false certifications.  *See* Exhibit 6 attached hereto.

37.   Southern Mills states, on information and belief, that these false certifications were sent to the Small Business Administration by Nunes or others acting for him through the United States mail.

38.   On August 17, 2009, the Alaska District Office of the Small Business Administration sent a letter to Ms. Trudy Sobocienski of SNC stating that during a

-11-

US2008 1648470.6

recent meeting, "it was disclosed that … subsidiaries of Sitnasuak Native Corporation, have outside management and/or marketing agreements that have not been reviewed or approved by the Small Business Administration … and further that these agreements may not have been correctly addressed on SBA Form 1790, Report on Representatives Used, ..." *See* Exhibit 7 attached hereto.

39.     On September 10, 2009, the Small Business Administration sent another letter to Ms. Sobocienski of SNC stating that the agreements between Insight Holding and SNCT did not comply with SBA requirements and that they "must be terminated on or before *September 25, 2009*" (emphasis in original) or the Small Business Administration would initiate proceedings against SNC and its related companies to terminate them from the 8(a) program. *See* Exhibit 8 attached hereto.

40.     In compliance with this directive from the Small Business Administration, SNCT terminated the 2008 Agreement with Insight Holding on September 14, 2009.

41.     As a result of these actions by SNC and SNCT, Nunes lost control over SNCT.

-12-

**Southern Mills' "Defender M" and "SMI Blend" Fabrics**

42.    Prior to 2006, Southern Mills manufactured and sold certain flame resistant fabrics for military use.  Many of those fabrics were made from DuPont's Nomex® brand aramid fibers.  One of Southern Mills' military customers was SNCT, which purchased from Southern Mills flame resistant fabrics printed with the U.S. military's Universal Camouflage Pattern that were made from DuPont's N330 Nomex® flame resistant fiber.  Use of the N330 fiber was necessary for the fabric to meet the military specifications for Universal Camouflage Pattern flame resistant uniforms.  DuPont also sells a different version of Nomex® flame resistant fiber, called T-462, which is used in commercial applications.  The difference between N330 and the T-462 Nomex® fiber is that the N330 military grade fiber contains an additional 1% carbon fiber deemed necessary by the military to enhance the fibers' antistatic properties.  SNCT used the Southern Mills N330 based flame resistant fabric to manufacture battle dress uniforms and other garments for the U.S. military.

43.    Southern Mills had developed another flame resistant fabric using a flame resistant rayon fiber produced not by DuPont, but by Lenzing AG, an Austrian manufacturer.  Southern Mills created this fabric in 1997 and presented it to the U.S. Army in 1998, although the U.S. Army was not interested in purchasing

-13-

US2008 1648470.6

garments made from the fabric at that time. On March 15, 2005, Southern Mills obtained a U.S. patent on fabric of this type. The patent covers certain printed flame resistant fabric made with Lenzing fibers that is now generally referred to as the "Defender M" fabric.

44. In February 2006, Southern Mills also developed a much cheaper alternative to fabrics containing DuPont's N330 military grade Nomex® fiber, by blending extra carbon fiber with the T-462 commercial grade Nomex® in the fabric manufacturing process to create a Universal Camouflage Pattern Nomex®-based fabric that met the military's specifications, but was substantially cheaper to produce (the "SMI Blend fabric").

45. In the spring or summer of 2006, Southern Mills invited Nunes, as CEO of its customer, SNCT, to come to Southern Mills' Union City, Georgia offices. The purpose of the meeting was to show to SNCT the broad range of different Southern Mills flame resistant products and to explore whether there were any other products that might be sold to SNCT.

46. During this time frame (in the spring or summer of 2006), Nunes informed Southern Mills that the U.S. military was looking for a flame resistant fabric that it could use in military uniforms at a lower cost than the N330 Nomex®-based fabrics. Historically, most combat uniforms have not been made

-14-

from flame resistant fabric.  The military found in Iraq and Afghanistan, however, that many of the combat injuries suffered by U.S. troops were burn injuries resulting from explosive devices, and that such injuries could be reduced by using flame resistant uniforms.  Accordingly, by 2006 the military was interested in substantially increasing its use of flame resistant fabrics in uniforms, but the high cost of uniforms using N330 Nomex® was a problem for the military.

47.    Accordingly, Southern Mills, with assistance from Nunes (whom Southern Mills understood was the CEO of its major customer), pursued military acceptance of uniforms using the Defender M, Lenzing-fiber based fabrics, which are cheaper than fabrics with N330 Nomex®, because the Lenzing fiber itself is much cheaper.  Southern Mills and SNCT also pursued military acceptance of Southern Mills' SMI Blend fabric.

**Nunes Induces Southern Mills to Enter into a Rebate Agreement with Insight Holding Regarding Southern Mills' SMI Blend Fabric**

48.    Southern Mills has in place rebate programs with many of its customers.  Accordingly, in or about October of 2006, Southern Mills advised SNCT that in return for SNCT's assistance in pursuing government acceptance of Southern Mills' SMI Blend fabric as complying with government specifications, Southern Mills was willing to share the resulting savings on all such fabric purchased by SNCT.  Southern Mills proposed to Nunes that 50 cents per yard of

-15-

US2008 1648470.6

the savings be paid either in the form of a reduction in the contract price SNCT paid to Southern Mills for the SMI Blend fabric or in the form of a rebate to SNCT.

49.    Nunes responded that SNCT preferred a rebate as opposed to a discount, but that it should be accrued and paid at a later date.  At the time Nunes communicated this to Southern Mills, Insight Holding did not exist.  As detailed above, Insight Holding was not formed as a Delaware limited liability company until January 4, 2007.

50.    In early 2007, Nunes advised Southern Mills that the accrued rebate based on the cost savings from using Southern Mills' SMI Blend fabric should be paid to Insight Holding instead of SNCT, suggesting that under SBA rules the full amount of cost savings could not be realized in the form of a rebate to SNCT, but that a benefit could be provided by payment to a related company.

51.    On or about February 1, 2007, Nunes sent Southern Mills wiring instructions, instructing Southern Mills to wire the rebate payments to a bank account in the name of Insight Holding.

52.    Having never dealt with Insight Holding before, Southern Mills sought to ensure that Insight Holding was an entity controlled by SNC.  To that

-16-

US2008 1648470.6

end, Mark Christman of Southern Mills sent an e-mail to Nunes on February 2, 2007 that stated in relevant part as follows:

> The CYA instinct in me feels compelled to ask for some sort of confirmation from the Native Corporation that they control Insight and that the bank account in the wiring instructions is controlled by Insight.

*See* Exhibit 9 attached hereto.

53.     On February 16, 2007, in response to Mr. Christman's request, Nunes drafted a letter to Southern Mills, for the signature of SNC's then-President and CEO, Robert Fagerstrom, that falsely represented to Southern Mills that Insight Holding was a company that was related to SNC.  This led Southern Mills to believe that payments made to Insight Holding would inure to the benefit of SNC, and would enhance Southern Mills' relationship with SNCT.  At Nunes' direction, Fagerstrom signed the letter and sent it to Southern Mills through the U.S. mail, copying "Mr. James Nunes, SNCT."  *See* Exhibit 10 attached hereto.

54.     During this period, Nunes further represented to Southern Mills that, in line with SBA requirements, SNC did not "control" Insight Holding, *i.e.*, that SNC had less than a 50% ownership interest in Insight Holding.  Nunes, however, led Southern Mills to believe that SNC had a 49% ownership interest in Insight Holding.  These statements were made by Nunes over the interstate wires (by e-mail and telephone), in communications with Mark Christman of Southern Mills,.

-17-

US2008 1648470.6

55.    Relying on these false representations, and on or about February 22, 2007, Southern Mills entered into a Rebate Agreement with Insight Holding.  *See* Exhibit 11 attached hereto.  This agreement was negotiated and finalized using the interstate U.S. wires (by e-mail), including an e-mail between Mark Christman and Nunes dated February 22, 2007.  Southern Mills believed at the time that SNC had a significant ownership interest in Insight Holding and that SNC would be aware of and benefit from all payments to Insight Holding.  Shortly thereafter, Southern Mills began wiring (over interstate wires) rebate payments for sales of the SMI Blend fabric to Insight Holding.  Those payments, in the aggregate, amounted to more than $1.3 million through September 2009, which payments were effectively made to Nunes himself.

**Nunes Induces Southern Mills to Enter into a Sales Representative Agreement with Insight Holding Regarding Southern Mills' Defender M Fabric**

56.    The Defender M fabric developed by Southern Mills, unlike the SMI Blend fabric, included some fiber of foreign origin, requiring a legislative waiver from certain statutory requirements before the fabric could be used in any government contract.  A waiver was ultimately passed by Congress as part of a defense authorization act in January 2008.

57.    Both SNCT and Southern Mills approached the U.S. military about the use of Defender M fabric in manufacturing military apparel.  The U.S. military

-18-

conducted an evaluation of the Defender M fabric along with many other fabrics presented by SNCT and other garment manufacturers for consideration as lower cost flame resistant camouflage fabrics. The U.S. military ultimately accepted the Defender M fabric as a fabric for use in new fire resistant army combat uniform garments intended to replace existing non-fire resistant nylon/cotton uniforms.

58.    As with the SMI Blend fabric, Southern Mills agreed in discussions with Nunes that SNCT should receive a benefit from certain future sales of Defender M fabric. In these discussions, Southern Mills ultimately agreed that for every yard of Defender M fabric sold to any domestic purchaser through December 31, 2010, it would pay a $1 commission. Nunes arranged to have this contract entered into in the name of Insight Holding. The contract, attached hereto as Exhibit 12, was entered into on or about March 1, 2007, and was denominated a Sales Representative Agreement. Pursuant to this agreement, Southern Mills agreed to pay Insight Holding $1 for each yard of Defender M fabric sold. This agreement was negotiated and finalized using the interstate U.S. wires (by e-mail), including e-mail communications sent between Mark Christman and Nunes on March 6, 2007. Southern Mills continued to believe that Insight Holding was related by stock ownership to SNC and SNCT.

US2008 1648470.6

59.    In fact, Southern Mills later learned (and states on information and belief) that Nunes had caused SNCT to pay the legal fees incurred by Insight Holding in connection with the preparation of the Sales Representative Agreement. Southern Mills further states, on information and belief, that Nunes caused the United States mail to be used in connection with causing SNCT to pay these legal fees.

60.    As was the case with the SMI Blend fabric arrangements, Southern Mills was led to believe by Nunes that Insight Holding was a company related to SNC and SNCT.  Southern Mills was unaware that Nunes was the sole owner of Insight Holding; Southern Mills mistakenly believed that SNC had a significant ownership interest in Insight Holding; and Southern Mills further believed that SNC and SNCT had structured their affairs to obtain appropriate financial benefits while complying with SBA requirements.  Accordingly, Southern Mills had no objection to the request by Nunes, as CEO of its significant customer, that the contract be entered into in the name of Insight Holding.

61.    As a result of these misrepresentations by Nunes to Southern Mills, Insight Holding received a total of $12,299,890.49 in commission payments under the Sales Representative Agreement, wired (over interstate wires) from Southern Mills to Insight Holdings in the amounts and on the dates specified below:

-20-

| Date | Amount |
|------|--------|
| 7/10/07 | 69,792.00 |
| 10/17/07 | 479,965.00 |
| 12/21/07 | 886,727.00 |
| 1/31/08 | 67,031.00 |
| 4/18/08 | 944,188.00 |
| 7/17/08 | 1,114,104.00 |
| 10/17/08 | 1,242,655.00 |
| 12/30/08 | 1,764,621.49 |
| 1/21/09 | 85,956.00 |
| 4/15/09 | 2,417,679.00 |
| 7/28/09 | 1,806,000.00 |
| 9/30/09 | 1,421,272.00 |
| | |
| Total: | $12,299,840.49 |

**Nunes Induces Southern Mills to Enter into a Discount Agreement with SNCT Regarding Southern Mills' Defender M Fabric**

62.    On July 2, 2007, more than four months after the Sales Representative Agreement was executed, Nunes caused SNCT to enter into a Defender M Discount Agreement with Southern Mills.  The Discount Agreement called for SNCT to receive a $1 discount on every yard of Defender M fabric that SNCT purchased on competitively-bid contracts (there was to be no discount on SBA set-aside contracts).  *See* Exhibit 13 attached hereto.  This agreement was negotiated and finalized using the interstate U.S. wires (by e-mail), including an e-mail communication sent by Nunes to Mark Christman on June 18, 2007.  Nunes executed this agreement as the "CEO" of SNCT.

-21-

US2008 1648470.6

**Nunes Induces Southern Mills to Extend the Sales Representative Agreement
and Discount Agreement**

63.    Although not known to Southern Mills at the time, by the spring of

2009, the SNC Board of Directors had become disenchanted with the leadership of

SNC's President and CEO, Robert Fagerstrom, and significant questions had arisen

regarding the extraordinarily large amounts of money being paid to Nunes under

his arrangements with SNCT, separate and apart from the amounts that were paid

by Southern Mills, which were unknown to the SNC Board of Directors.  On April

1, 2009, the SNC Board of Directors asked Fagerstrom to resign, and SNC and

Fagerstrom signed a severance agreement.  Within two days, however, Fagerstrom

was elected CEO of SNCT, and signed a new employment agreement with SNCT.

On information and belief, this was done without the knowledge of the SNC Board

of Directors, which had asked for Fagerstrom's resignation from SNC.  SNCT had

a separate board, which was smaller than the SNC board.

64.    In early May 2009, Fagerstrom was not re-elected to the SNC Board

of Directors.  Also, in May 2009, SNC began investigating the history of SNCT's

management.

65.    Beginning in late May, 2009, Nunes contacted Southern Mills and

requested extensions of the Defender M Discount Agreement and the Sales

Representative Agreement.  Nunes did not disclose to Southern Mills that

-22-

US2008 1648470.6

Fagerstrom had been terminated by SNC, that Nunes' and Fagerstrom's positions with SNCT were in peril, or that Insight Holding was wholly-owned by Nunes.

66.    Because SNCT was a major customer of Southern Mills through multi-million dollar purchases of flame resistant fabrics, and because Southern Mills wanted to continue its existing, substantial relationship with the SNC group of companies, Southern Mills' management, to accommodate its major customer, agreed to negotiate extensions.  These extensions were negotiated solely by Nunes on behalf of both SNCT and Insight Holding (by interstate e-mail and telephone, using the U.S. wires), using a single law firm for both entities, in a manner consistent with SNCT and Insight Holding being part of the same family of companies under common management

67.    On May 25, 2009, in connection with the on-going organizational changes at SNC, there was also an organizational change at SNCT, and new SNCT board members were elected.  Fagerstrom was terminated by SNCT on May 26, 2009.

68.    On July 9, 2009, as a result of the negotiations pursued by Nunes, amendments to the Defender M Discount Agreement and the Sales Representative Agreement were signed, modifying them and extending their terms (again, by e-mail, over interstate U.S. wires, including e-mail communications from Nunes to

US2008 1648470.6

Mark Christman dated June 29, 2009 and July 9, 2009).  *See* Exhibit 14 attached hereto.  At this time, Southern Mills still was not aware of the true ownership of Insight Holding, nor was it aware of the management changes that had occurred at SNC and SNCT, or that Nunes' arrangements were under investigation.  Nunes continued to act on behalf of both SNCT and Insight Holding, however, presenting the extensions as a "package deal" with these purportedly related companies.

### Nunes' Scheme to Defraud Is Exposed

69.    Later, in August 2009, SNC provided the Insight Holding consulting agreements with the various SNC companies to the Small Business Administration. On September 10, 2009, the Small Business Administration informed SNC that the agreements between Insight Holding and SNCT and two other SNC "8(a)" qualified companies gave Insight Holding too much management authority over SNCT and the other qualified companies and did not comply with SBA guidelines. *See* Exhibit 8 hereto.  The Small Business Administration required their termination.  Accordingly, SNCT terminated all of Insight Holding's agreements with SNCT by letter dated September 14, 2009.

70.    On or about September 16, 2009, a few days after SNCT terminated the management contract with Insight Holding and Nunes, Southern Mills learned from an employee of SNCT that Insight Holding was 100% owned by Nunes.  This

-24-

US2008 1648470.6

was the first time that Southern Mills had any information suggesting that Nunes was the sole owner of Insight Holding and that Insight Holding was not related to SNC or SNCT.

71.    This information prompted Mark Christman of Southern Mills to ask Nunes directly at a lunch meeting in Georgia on September 28, 2009 whether or not Nunes owned 100% of Insight Holding.  When Nunes confirmed that he did, Mr. Christman asked how long that had been the case.  Nunes confirmed that that he had always owned 100% of Insight Holding.

72.    Also around this time, SNC continued its investigation of Nunes' arrangements with SNCT.  In response to that investigation, Nunes urged Southern Mills not to share any information with SNC, claiming that confidentiality provisions in the agreements between Insight Holding and Southern Mills prevented Southern Mills from disclosing information to SNC or SNC's counsel. For example, in an e-mail from Nunes to Mark Christman dated October 8, 2009, Nunes advised Mr. Christman to "please make sure that no one at Tencate [Southern Mills] discusses with SNC the Insight/Tencate business."  In a subsequent e-mail sent by Nunes to Mr. Christman on October 10, 2009, Nunes warned:  "We do have a confidentiality agreement in place.  I expect you to honor it."

-25-

73.    In light of its discovery that Insight Holding was secretly wholly-owned by Nunes and was not related to SNC or SNCT, Southern Mills advised Insight Holding in a letter dated November 11, 2009 (attached hereto as Exhibit 15) that it was rescinding the Rebate Agreement and the Sales Representative Agreement, and ceased making any further payments to Insight Holding under those agreements.

## COUNT ONE

### Violations of Federal RICO

74.    Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

Predicate Acts

75.    Nunes has engaged in predicate acts that are defined to constitute "racketeering activity" under the Federal RICO statute.  18 U.S.C. § 1961(1).

76.    Specifically, Nunes engaged in mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).  Nunes engaged in mail and wire fraud by (a) perpetrating a scheme to defraud Southern Mills, by, among other things, misleading Southern Mills about Insight Holding's relationship to SNC and SNCT; (b) he thereby directly participated in that scheme to defraud; (c) Nunes had a specific intent to defraud Southern Mills, in that he wanted to enrich himself at

-26-

Southern Mills' expense; and (d) the United States mails and wires were used in furtherance of that scheme (see paragraphs 29, 37, 52, 53, 54, 55, 58, 59, 61, 62, 66, 68, and 72 above, relative to the use of the U.S. mail and interstate wires).

77.     Each of the instances identified above, when Nunes (or others acting at his direction) communicated with Southern Mills by United States mail or the interstate wires (see paragraphs 52, 53 and 54), and each of the instances when Nunes caused Southern Mills to enter into agreements with and wire payments to Insight Holding using the interstate wires (see paragraphs 55, 58, 61, 62, 66 and 68), constituted a separate predicate act of mail fraud or wire fraud, as the case may be, because Nunes in each instance either communicated a misrepresentation to Southern Mills, or otherwise failed to correct a false impression of an existing fact that he previously created or confirmed.

78.     Moreover, Nunes engaged in mail fraud by sending, or by directing others to send, false certifications to the Small Business Administration through the U.S. mail, and by causing SNCT to pay (and thereby defrauding SNCT with respect to) the amounts required to form Insight Holding as an entity in Delaware and to prepare the Sales Representative Agreement with Southern Mills (see paragraphs 29, 37 and 59 above).

US2008 1648470.6

Pattern of Racketeering Activity

79.    These incidents of racketeering activity were not isolated incidents but were separate yet interrelated acts forming a systematic and ongoing pattern.

80.    This racketeering activity started in mid-2006 (at the latest) and continued through September 30, 2009.

81.    Nunes engaged in at least two acts of racketeering activity, all of which have occurred within the last four years.  These acts of racketeering activity have been conducted as part of the same scheme, having the same or similar intents, results, accomplices, victims, and methods of commission.  The victims include Southern Mills, SNC, and SNCT.  Therefore, Nunes has engaged in a pattern of racketeering activity, as defined under 18 U.S.C. § 1961(5).

Enterprise

82.    Insight Holding Group, LLC and SNC Telecommunications, LLC are each an "enterprise" as defined by 18 U.S.C. § 1961(4).  During the relevant time period, each of these enterprises engaged in interstate commerce.

83.    Nunes operated Insight Holding Group, LLC as an enterprise to perpetrate a fraud on Southern Mills, SNC, and SNCT.  Nunes operated SNCT as an enterprise to perpetrate a fraud on Southern Mills, as well as to victimize SNC and SNCT.

-28-

US2008 1648470.6

84.    Additionally, Nunes and non-party Robert Fagerstrom constituted an "association in fact" enterprise under 18 U.S.C. § 1961(4), because they were a group of individuals associated in fact, although not a legal entity.  As an "association in fact" enterprise, Nunes and Fagerstrom had (a) a purpose – to perpetrate a fraud on Southern Mills, SNC, and SNCT; (b) relationships among those associated with the enterprise – Nunes exercised a position of authority over Fagerstrom in this "association in fact" enterprise in directing Fagerstrom to send his false letter of February 16, 2007 to Southern Mills; and (c) longevity sufficient to permit Nunes and Fagerstrom (over a course of several years) to pursue the enterprise's purpose.

Substantive RICO Violations

85.    In violation of 18 U.S.C. § 1962(b), Nunes, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of enterprises (SNCT and Insight Holding) engaged in interstate commerce.

86.    In violation of 18 U.S.C. § 1962(c), Nunes, who was employed by distinct enterprises engaged in interstate commerce (Insight Holding and SNCT), and otherwise associated with an enterprise engaged in interstate commerce (the "association in fact" enterprise consisting of Nunes and non-party Fagerstrom), has

-29-

conducted or participated, directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity.

87.    In violation of 18 U.S.C. § 1962(d), Nunes and non-party Fagerstrom conspired to violate the provisions of 18 U.S.C. § 1962(b) and 18 U.S.C. § 1962(c).

RICO Injury and Remedy

88.    Nunes has harmed Southern Mills by perpetrating a scheme to defraud Southern Mills.

89.    Southern Mills has suffered injury to its business or property by reason of Nunes' violations of 18 U.S.C. § 1962, and is entitled to judgment against Nunes for all resulting damages.  Among other injuries, Southern Mills has suffered injury by, as a proximate result of Nunes' scheme to defraud, paying Nunes approximately $13.5 million, in the form of payments made to Insight Holding, an entity secretly wholly-owned by Nunes, instead of to an entity (1) related to its major customer, SNCT, and (2) with relationships to the U.S. military as part of major, on-going arrangements to supply uniforms.  Therefore, pursuant to 18 U.S.C. § 1964(c), Southern Mills is entitled to recover treble damages (over $40 million).

US2008 1648470.6

90.     Pursuant to 18 U.S.C. § 1964(c), Southern Mills is entitled to the reasonable attorneys' fees and costs incurred by Southern Mills to prosecute this lawsuit.

## COUNT TWO

## Violations of the Georgia RICO Act

91.     Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

Incidents of Racketeering Activity

92.     Nunes has engaged in acts that constitute theft by deception, as prohibited by O.C.G.A. § 16-8-3.

93.     Specifically, Nunes has obtained the property (money) of Southern Mills by deceitful means or artful practice with the intention of depriving Southern Mills of that property.  *See* O.C.G.A. § 16-8-3.

94.     In furtherance of this scheme to defraud, Nunes committed various deceitful acts.  Nunes created another's (Southern Mills') impression of an existing fact (including that Insight Holding purportedly was an entity related to SNC and SNCT) that Nunes knew or believed to be false.  *See* O.C.G.A. § 16-8-3(b)(1). Additionally, Nunes induced Southern Mills to make multiple payments to Insight Holding of over $13.5 million on the dates specified in paragraphs 55 and 61

-31-

US2008 1648470.6

above.  With respect to each of those payments by Southern Mills, Nunes failed to correct a false impression of an existing fact or past event that he previously created or confirmed.  *See* O.C.G.A. § 16-8-3(b)(2).  Accordingly, each payment that Nunes induced Southern Mills to make to Insight Holding constituted a separate incident of theft by deception under Georgia law.

95.    Nunes engaged in mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).  Nunes engaged in mail and wire fraud by (a) perpetrating a scheme to defraud Southern Mills, by, among other things, misleading Southern Mills about Insight Holding's relationship to SNC and SNCT; (b) he thereby directly participated in that scheme to defraud; (c) Nunes had a specific intent to defraud Southern Mills, in that he wanted to enrich himself at Southern Mills' expense; and (d) the United States mails and wires were used in furtherance of that scheme (see paragraphs 29, 37, 52, 53, 54, 55, 58, 59, 61, 62, 66, 68, and 72 above, relative to the use of the U.S. mail and interstate wires).

96.    Each of the instances identified above, when Nunes (or others acting at his direction) communicated with Southern Mills by United States mail or the interstate wires (see paragraphs 52, 53 and 54), and each of the instances when Nunes caused Southern Mills to enter into agreements with and wire payments to Insight Holding using the interstate wires (see paragraphs 55, 58, 61, 62, 66 and

-32-

68), constituted a separate predicate act of mail fraud or wire fraud, as the case may be, because Nunes in each instance either communicated a misrepresentation to Southern Mills, or otherwise failed to correct a false impression of an existing fact that he previously created or confirmed.

97.    Moreover, Nunes engaged in mail fraud by sending, or by directing others to send, false certifications to the Small Business Administration through the U.S. mail, and by causing SNCT to pay (and thereby defrauding SNCT with respect to) the amounts required to form Insight Holding as an entity in Delaware and to prepare the Sales Representative Agreement with Southern Mills (see paragraphs 29, 37 and 59 above).

Pattern of Racketeering Activity

98.    These incidents of racketeering activity were not isolated incidents but were separate yet interrelated acts forming a systematic and ongoing pattern.

99.    This racketeering activity started in mid-2006 (at the latest) and continued through September 30, 2009.

100.   Nunes engaged in at least two incidents of racketeering activity, all of which have occurred within the last five years.  These incidents of racketeering activity have been conducted as part of the same scheme, having the same or similar intents, results, accomplices, victims, and methods of commission.  The

US2008 1648470.6

victims include Southern Mills, SNC, and SNCT.  Therefore, Nunes has engaged in a pattern of racketeering activity, as defined under O.C.G.A. § 16-14-3.

Enterprise

101.   Insight Holding Group, LLC and SNC Telecommunications, LLC are each an "enterprise" as defined by O.C.G.A. § 16-14-3(6).

102.   Nunes operated Insight Holding Group, LLC as an enterprise to perpetrate a fraud on Southern Mills, SNC, and SNCT.  Nunes operated SNCT as an enterprise to perpetrate a fraud on Southern Mills, as well as to victimize SNC and SNCT.

103.   Additionally, Nunes and non-party Robert Fagerstrom constituted an "association in fact" enterprise as defined under O.C.G.A. § 16-14-3(6), because they were a group of individuals associated in fact, although not a legal entity.  As an "association in fact" enterprise, Nunes and Fagerstrom had (a) a purpose – to perpetrate a fraud on Southern Mills, SNC, and SNCT; (b) relationships among those associated with the enterprise – Nunes exercised a position of authority over Fagerstrom in the "association in fact" enterprise in directing Fagerstrom to send his false letter of February 16, 2007 to Southern Mills; and (c) longevity sufficient to permit Nunes and Fagerstrom (over a course of several years) to pursue the enterprise's purpose.

-34-

## Substantive RICO Violations

104. In violation of O.C.G.A. § 16-14-4(a), Nunes, through a pattern of racketeering activity or proceeds derived therefrom, acquired or maintained, directly or indirectly, an interest in or control of two enterprises (SNCT and Insight Holding).

105. In violation of O.C.G.A. § 16-14-4(b), Nunes, who was employed by distinct enterprises (Insight Holding and SNCT), and otherwise associated with an enterprise (the "association in fact" enterprise consisting of Nunes and non-party Fagerstrom), has conducted or participated in, directly or indirectly, such enterprises through a pattern of racketeering activity.

106. In violation of O.C.G.A. § 16-14-4(c), Nunes and non-party Fagerstrom conspired to violate the provisions of O.C.G.A. § 16-14-4(a) and § 16-14-4(b).

## Injury and Remedy under Georgia RICO

107. Nunes has harmed Southern Mills by perpetrating a scheme to defraud Southern Mills.

108. Southern Mills has been injured by reason of these violations of O.C.G.A. § 16-14-4 and is entitled to judgment against Nunes for all resulting damages. Among other injuries, Southern Mills has suffered injury by, as a

-35-

US2008 1648470.6

proximate result of Nunes' scheme to defraud, paying Nunes approximately $13.5 million, in the form of payments made to Insight Holding, an entity secretly wholly-owned by Nunes, instead of to an entity (1) related to its major customer, SNCT, and (2) with relationships to the U.S. military as part of major, on-going arrangements to supply uniforms. Therefore, pursuant to O.C.G.A. § 16-14-6(c), Southern Mills is entitled to three times its actual damages sustained (over $40 million), as well as punitive damages.

109. Pursuant to O.C.G.A. § 16-4-6(c), Southern Mills is entitled to its attorneys' fees, costs of investigation, and litigation reasonably incurred in prosecuting this lawsuit.

## COUNT THREE

## Fraud

110. Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

111. During the period 2006 through 2009, Southern Mills entered into a series of agreements pursuant to which it agreed to make payments to Insight Holding, under the belief that those payments would inure to the benefit of Southern Mills' major customer, SNCT, as part of a package arrangement with this very substantial garment supplier with close ties to the U.S. military, and further

-36-

US2008 1648470.6

believing that Southern Mills would obtain a benefit through this overall, continuing relationship.

112.   To induce those agreements, Nunes made false representations to Southern Mills that SNC had a substantial ownership interest in Insight Holding, and that Insight Holding was a company related to SNC and SNCT.

113.   Nunes knew the representations were false when he made them to Southern Mills.

114.   Nunes made the false representations in an effort to induce Southern Mills to make payments directly to Insight Holding, and to enter into the Rebate Agreement and the Sales Representative Agreement with Insight Holding.  Nunes also made false representations and concealed material facts in inducing Southern Mills to agree to extensions of those agreements.

115.   Nunes knew that Southern Mills would rely upon these false representations.

116.   Southern Mills did in fact reasonably rely to its detriment upon Nunes' false representations.  As a result of this scheme to defraud, Southern Mills made payments to Nunes, through Insight Holding, and agreed to contracts with Insight Holding.  Southern Mills would not have made these payments or entered into those contracts had it known the true facts.

US2008 1648470.6

117.   As a proximate result of Nunes' scheme to defraud, Southern Mills has been damaged, in an amount to be proven at trial, but in an amount not less than $13,599,890.49.

## COUNT FOUR

### Conspiracy to Defraud

118.   Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 and 111 through 117 above, as if fully set forth herein.

119.   Nunes and non-party Fagerstrom entered into a conspiratorial agreement to perpetrate a scheme to defraud Southern Mills.

120.   Specifically, Nunes and Fagerstrom agreed that Fagerstrom would send Southern Mills the letter dated February 16, 2007, which falsely represented to Southern Mills that Insight Holding was a company related to SNC and SNCT. Nunes and Fagerstrom entered into this agreement for the purpose of inducing Southern Mills to make payments of millions of dollars directly to Insight Holding.

121.   As a proximate result of this conspiracy to defraud, Southern Mills has been damaged, in an amount to be proven at trial, but in an amount not less than $13,599,890.49.

US2008 1648470.6

## COUNT FIVE

### Unjust Enrichment

122.   Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

123.   Southern Mills states, on information and belief, that Nunes received the personal benefit of the payments made by Southern Mills to Insight Holding, an entity secretly wholly owned by Nunes.  It would be against equity and good conscience for Nunes to be unjustly enriched by receiving the benefit of those payments from Southern Mills.  Indeed, the enrichment obtained by Nunes as a result of those payments greatly exceeds by an order of magnitude any contribution he individually made to any sales of Southern Mills fabrics.

124.   Nunes knew about the payments and knowingly accepted the benefits of those payments.

125.   Southern Mills did not know that the payments to Nunes would inure solely to Nunes' personal benefit.  Now that Southern Mills is aware that Nunes unjustly appropriated the payments for his own sole benefit, Southern Mills – under the circumstances now known – fully expects to be reimbursed for those payments which, as the proximate result of Nunes' fraud, were made to Nunes.

-39-

US2008 1648470.6

126. Accordingly, Nunes should be required to provide restitution to Southern Mills or otherwise to disgorge to Southern Mills the amounts received by Nunes.

## COUNT SIX

## Attorneys' Fees

127. Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

128. Nunes has acted in bad faith, has been stubbornly litigious, and has caused Southern Mills unnecessary trouble and expense, justifying an award of reasonable attorneys' fees and expenses of litigation, pursuant to O.C.G.A. § 13-6-11.

## COUNT SEVEN

## Punitive Damages

129. Southern Mills incorporates by reference the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

130. Nunes acted with the purpose of intentionally causing harm to Southern Mills. Nunes' actions constituted willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

-40-

US2008 1648470.6

131.   Accordingly, and pursuant to O.C.G.A. § 51-12-5.1, Southern Mills is entitled to an award of punitive damages against Nunes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Southern Mills Inc. d/b/a TenCate Protective Fabrics, respectfully requests the following relief:

(a)   That judgment be entered in favor of Southern Mills and against Nunes in the principal amount of $13,599,890.49;

(b)   That judgment be entered in favor of Southern Mills and against Nunes for all other compensatory damages allowed by law;

(c)   That Southern Mills be awarded treble damages;

(d)   That judgment be entered in favor of Southern Mills and against Nunes for restitution, on Southern Mills' claim for unjust enrichment;

(e)   That Southern Mills be awarded prejudgment interest;

(f)   That Southern Mills be awarded its attorneys' fees and expenses of litigation incurred in prosecuting this action;

(g)   That Southern Mills be awarded punitive damages; and

(h)   That this Court grant any additional and further relief that it deems just and appropriate under the circumstances.

-41-

-42-

This 15th day of October, 2010.

/s/ Angela N. Frazier
James F. Bogan III (Ga. Bar No. 065220)
jbogan@kilpatrickstockton.com
Angela N. Frazier (Ga. Bar No. 141239)
anfrazier@kilpatrickstockton.com
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street
Suite 2800
Atlanta, Georgia 30309-4530
Telephone: (404) 815-6500
Facsimile: (404) 815-6555

Counsel for Plaintiff Southern Mills Inc.
d/b/a TenCate Protective Fabrics

US2008 1648470.6