IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SOUTHERN MILLS, INC. d/b/a | : | |
| TENCATE PROTECTIVE | : | |
| FABRICS, | : | |
| | : | |
|     Plaintiff, | : | CIVIL ACTION NO. |
| | : | 1:10-CV-03340-RWS |
| v. | : | |
| | : | |
| H. JAMES NUNES, | : | |
| | : | |
|     Defendant. | : | |
| | : | |
| | : | |

## ORDER

This case is before the Court for consideration of Defendant's Motion to Compel Arbitration and Dismiss the Complaint or, in the alternative, to Stay These Proceedings [7]. After reviewing the record, the Court enters the following Order.

## Background

The dispute in this case arises out of a series of communications and agreements involving Plaintiff Southern Mills, Inc. ("Plaintiff" or "Southern Mills") and Defendant James Nunes ("Defendant" or "Nunes"), who acted as an agent for Sitnasuak Native Corporation ("SNC"), SNC Telecommunications,

AO 72A
(Rev.8/82)

LLC ("SNCT"), Insight Holding Group, LLC ("Insight Holding"), and Insight Consulting Group, LLC ("Insight Consulting"). (Dkt. No. [1] at ¶¶ 6–9, 12, 20). Southern Mills develops, manufactures, and sells flame resistant fabrics. (Id. at ¶ 5). SNC is a corporation headquartered in Alaska, and SNCT is "a wholly-owned subsidiary of SNC and a major buyer of flame resistant fabrics from Southern Mills," which are used in apparel for military personnel (Id. at ¶¶ 7–8, 19). Starting in 2004, Nunes functioned as Chief Executive Officer ("CEO") of SNCT. (Id. at ¶ 24). Nunes also acted as CEO for Insight Holding and Insight Consulting and in fact was the sole owner and employee of the companies (although SNC eventually acquired a 51% interest in Insight Consulting). (Id. at ¶¶ 9, 20, 27).

In 2006, Southern Mills and Nunes, acting as SNCT's CEO, began to discuss possible cooperation in pursuing "military acceptance of uniforms" that use specialized fabric manufactured by Plaintiff. (Id. at ¶¶ 46–49). Several agreements were eventually reached, some of which involved Southern Mills making payments to Insight Holding. (Id. at ¶¶ 6, 8, 50, 55, 58). During this time, Defendant allegedly made several misrepresentations—such as SNC owning 49% of Insight Holding—that led Southern Mills "to believe that it was dealing at all times with a family of companies that were all either affiliated

2

with or related by stock ownership to SNC." (<u>Id.</u> at ¶¶ 10–13, 20, 54).

Furthermore, in Southern Mills' initial dealing with Insight Holding, then-

President and CEO of SNC, Robert Fagerstrom ("Fagerstrom"), drafted a letter

that led "Southern Mills to believe that payments made to Insight Holding

would inure to the benefit of SNC, and would enhance Southern Mills'

relationship with SNCT." (<u>Id.</u> at ¶¶ 52–53).

      Because of Nunes' misrepresentations and the mistaken belief that SNC

had a significant ownership interest in Insight Holding, Southern Mills entered

into several contracts with SNCT and Insight Holding. (<u>Id.</u> at ¶¶ 55, 58, 60, 62).

These included: (I) a Rebate Agreement with Insight Holding on February 22,

2007, in which Southern Mills would wire money to Insight Holding in

exchange for SNCT's assistance in pursuing government acceptance of

Southern Mills' fabric; (II) a Sales Representative Agreement with Insight

Holding on March 1, 2007, in which a $1 commission would be paid to Insight

Holding for each yard of Plaintiff's fabric sold; and (III) a Discount Agreement

with SNCT on July 2, 2007, in which SNCT would receive a $1 discount for

every yard of Plaintiff's fabric purchased on competitively bid contracts. (<u>Id.</u>).

The Sales Representative Agreement includes a broad arbitration provision that

stipulates "[a]ny controversy between the parties shall be settled by arbitration," but the other agreements lack such a provision. (Dkt. No. [1-1] at 47).

In April and May 2009, the SNC Board of Directors ("Board") forced Fagerstrom to resign as SNC President and CEO, and he was not reelected to the Board. (Id. at ¶¶ 63–64). He was, however, quickly elected CEO of SNCT within two days of his termination—unbeknownst to the SNC Board. (Id.) Although SNC began to investigate SNCT's management in May 2009, Nunes requested from Southern Mills an extension of the Discount Agreement and Sales Representative Agreement, which Southern Mills readily accepted to ensure a continued business relationship with SNC and its subsidiaries. (Id. at ¶¶ 65–66, 68).

Southern Mills finally learned in September 2009 from an SNCT employee that Insight Holding was wholly-owned by Nunes. (Id. at ¶ 70). When an agent of Southern Mills inquired about this to Nunes on September 28, 2009, Nunes confirmed that he was the sole owner. (Id. at ¶ 71). In turn, Southern Mills advised Insight Holding that "it was rescinding the Rebate Agreement and the Sales Representative Agreement" and would cease further payment. (Id. at ¶ 73). In all, Plaintiff paid Insight Holding "more than $1.3 million" under the Rebate Agreement and "a total of $12,299,890.49 in commission payments

4

under the Sales Representative Agreement," with the payments made effectively to Nunes himself. (Id. at ¶¶ 55, 61).

After Plaintiff initiated arbitration against Insight Holding, Southern Mills also filed a Complaint [1] in federal court against Nunes individually on October 15, 2010, that alleged fraud, conspiracy to defraud, unjust enrichment, and violations of both the federal and Georgia RICO statutes. (Id. at ¶¶ 74–126; Dkt. No. [9] at 7–8). On December 20, 2010, Defendant filed a Motion to Compel Arbitration and Dismiss the Complaint, or, in the alternative, to Stay These Proceedings [7] ("Motion to Compel"). On January 13, 2011, Plaintiff filed its Brief in Opposition to Defendant's Motion to Compel Arbitration and Dismiss the Complaint, or, in the alternative, to Stay These Proceedings [9] ("Plaintiff's Opposition"). On January 31, 2011, Defendant filed his Reply Brief in Support of Motion to Compel Arbitration or, in the alternative, to Stay These Proceedings [19] ("Defendant's Reply").

## Discussion

### I. Nunes' Invocation of the Arbitration Agreement

In deciding whether to stay court proceedings or compel arbitration under the Federal Arbitration Act ("FAA"), the Court must determine: (1) whether there is a valid written agreement to arbitrate; (2) whether the issue is arbitrable

5

under the agreement; and (3) whether the party asserting claims has failed or refused to arbitrate the claims. See Collins v. Int'l Dairy Queen, 990 F. Supp. 1469, 1471 (M.D. Ga. 1998) (citing 9 U.S.C. §§ 2–4). Both parties agree that the original contract contains a valid written agreement to arbitrate, but they do not agree whether Nunes—a nonsignatory to the arbitration agreement who signed the agreement on the behalf of Insight Holding and thus facilitated the fraud against Southern Mills—can compel arbitration of Plaintiff's claims.

The FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). The FAA's main goal is to move "the parties to an arbitrable dispute out of court and into arbitration as quickly as possible." Green Tree Fin. Corp-Alabama v. Randolph, 531 U.S. 79, 85 (2000) (citing Moses, 460 U.S. at 22). Furthermore, the FAA establishes that "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses, 460 U.S. at 24–25.

6

Federal policy strongly favors arbitration. <u>Becker v. Davis</u>, 491 F.3d 1292, 1298 (11th Cir. 2007). However, a party may not be compelled under the Federal Arbitration Act to submit to arbitration unless there is a contractual basis for concluding that the party agreed to do so. <u>Stolt-Nielson v. AnimalFeeds Int'l Corp.</u>, -- U.S. --, 130 S. Ct. 1758, 1775 (2010). While generally an express agreement to waive a right to trial is required, the Eleventh Circuit has recognized three limited exceptions:

> [First,] equitable estoppel … allow[s] nonsignatories to a contract to compel arbitration. A second exception exists when, under agency or related principles, the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided. A third exception arises when the parties to a contract together agree, upon formation of their agreement, to confer certain benefits thereunder upon a third party, affording that third party rights of action against them under the contract.

<u>MS Dealer Serv. Corp. v. Franklin</u>, 177 F.3d 942, 947 (11th Cir. 1999) (citations and quotation marks omitted). Defendant argues the Court should compel arbitration under the equitable estoppel and agency exceptions. (Dkt. No. [7-1] at 12–21). For the reasons discussed below, the Court holds that the

agency exception applies so that Defendant can invoke the arbitration agreement.[1]

Under Eleventh Circuit precedent, the issue is whether "the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided." MS Dealer, 177 F.3d at 947. Defendant argues that such an agency relationship exists here between him and Insight Holding because the "case against Mr. Nunes is 'inherently separable' from [the] case against Insight" and Nunes was the company's sole owner, member, and manager, which surely qualifies him as the its agent. (Dkt. No. [7-1] at 18, 20). Furthermore, he argues that the facts of the case here are similar to other cases—namely Campaniello Imports, Ltd. v. Saporiti Italia, S.P.A., 117 F.3d 655 (2d Cir. 1997)—in which courts have held an agency exception applies so that nonsignatories could invoke an arbitration agreement. (Id. at 17–20).

Plaintiff argues, however, that "Nunes' argument is precluded by Southern Mills' allegations that he lied about his agency relationship with

---

[1]The Court does not address the merits of Defendant's other arguments or the Plaintiff's contractual defenses thereto.

Insight in that he "fraudulently induced Southern Mills to enter into contracts with Insight … by concealing the fact that he and he alone would benefit from payments to Insight." (Dkt. No. [9] at 17–18).

Precedent holds that agents of a signatory to an arbitration agreement can themselves invoke the signatory's agreement. See, e.g., Roby v. Corp. of Lloyd's, 996 F.2d 1353, 1360 (2d Cir. 1993) (dismissing an attempt to distinguish "controlling persons" from the widespread, consistent holding amount circuits "that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement"); Arnold v. Arnold Corp., 920 F.2d 1269, 1281–82 (6th Cir. 1990) (affirming a district court's grant of a motion to compel arbitration by an agent). "If it were otherwise, it would be too easy to circumvent the agreements by naming individuals as defendants instead of the entity [] themselves." Roby, 996 F.3d at 1360.

However, Plaintiff argues that because it would not have agreed to the contract but for Nunes' fraud, Nunes should not be able to be subject to the clause. While "fraud in the inducement of the arbitration clause itself … may be adjudicated by the court, … the federal court [cannot] consider claims of fraud in the inducement of the contract generally."Campaniello, 117 F.3d at 666 (quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 403–04

(1967)) (quotation marks omitted). For example, in <u>Campaniello</u>, the appellants

argued that they were not bound to arbitrate their claims against the appellees

because the agreement was fraudulently induced and because the agent of

defendant should not enjoy the arbitration provision's protection. <u>Id.</u> at 666,

668. The Second Circuit dismissed the attempt to escape arbitration by alleging

fraudulent inducement because "in every instance where there is a fraud going

to the contract generally and an allegation that the arbitration clause was part of

the scheme to defraud, the court would have to adjudicate the entire scheme," in

effect eviscerating the purpose of arbitration. <u>Id.</u> at 667. The Second Circuit

also held that "[s]ince appellants' claims against [the agent] arise out of his

relationship with [his employer], they are also subject to mandatory arbitration."

<u>Id.</u> at 669.

Indeed, the similarities between <u>Campaniello</u> and the case here are

significant.[2] Southern Mills asserts that Nunes is not protected under the

agency exception because he fraudulently induced the agreement that contains

the arbitration provision. However, Nunes in fact was Insight Holding's sole

---

[2]Plaintiff's assertion that <u>Sokol Holdings, Inc. v. BNB Munai, Inc.</u>, 542 F.3d
355 (2d Cir. 2008), clarified the agency relationship necessary to make the issue one
of contractual assent is erroneous because that case dealt with collateral estoppel and
does not mention the agency exception or <u>Campaniello</u>.

agent, and any attempt to adjudicate whether the arbitration provision was fraudulently induced would turn into an evaluation of the entire case's merits. Moreover, Plaintiff admits that it thought Nunes was Insight's CEO and majority owner at the time of contract. (Dkt. No. [1] at ¶ 31). It should not be shocked to arbitrate its claims against Nunes, whom Plaintiff thought at the time was still Insight's disclosed agent.

While the claims arising out of the Sales Representative Agreement are clearly subject to arbitration, the arbitrability of the remaining claims are less clear. The arbitration provision in the Sales Representative Agreement provides that "[a]ny controversy between the parties shall be settled by arbitration." (Dkt. No. [1-1] at 47). No such provision exists in the Rebate Agreement. (Id. at 37). However, the Court finds the inclusion of the broad arbitration provision in the second agreement to control "any" dispute between the parties, regardless of the Rebate Agreement's lack of such a provision. See United Steelworkers of America v. Fort Pitt Steel Casting, 484 F. Supp. 1228, 1231 (W.D. Pa. 1980) ("Once a court finds that … the parties are subject to an agreement to arbitrate, and that agreement extends to 'any difference' between them, [the court] is required to consign the case to arbitration.") (internal quotation marks omitted) (quoting Int'l Union of Operating Engineers, Local 150 v. Flair Builders, Inc.,

406 U.S. 487, 491 (1972)). This conclusion is strengthened by the Sales

Representative Agreement's execution after the Rebate Agreement, which

raises the inference that the broad arbitration provision was meant to encompass

the prior agreement. Cf. Four Seasons Hotels and Resorts B.V. v. Consorcio

Barr, S.A., 613 F. Supp. 2d 1362, 1368–69 (finding that an arbitration provision

did not apply to a second agreement because the second agreement says that it

"supersede[s] all prior agreements").

      Furthermore, a court should favor arbitrability "unless it may be said with

positive assurance that the arbitration clause is not susceptible of an

interpretation that covers the asserted dispute. Doubts should be resolved in

favor of coverage. … [O]nly the most forceful evidence of a purpose to exclude

the claim from arbitration can prevail … ." United Steelworkers of America v.

Warrior and Gulf Navigation Co., 363 U.S. 574, (1960). In light of the broad

language of the arbitration provision in the Sales Representative Agreement and

the federal policy strongly in favor of arbitration, the Court will compel the

parties to arbitrate all claims. The arbitrator can determine whether all of the

claims are in fact arbitrable. Lefkovitz v. Wagner, 395 F.3d 773, 782 (7th Cir.

2005) ("[W]here [a] matter is before an arbitrator, the discretion should be his

to exercise, with due regard for the principle that the scope of the arbitrator's authority is defined by the arbitration clause itself.").

## II. Stay or Dismissal of the Case

The FAA states that when "any suit or proceeding [is] brought in [a district court] upon any issue referable to arbitration under an agreement," the Court shall "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; see also Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 218 (1985). Thus, the Court must compel arbitration and stay the underlying action.

### Conclusion

For the aforementioned reasons, Defendant's Motion to Compel Arbitration [7] is **GRANTED**. These proceedings are **STAYED** until the arbitrator resolves the underlying arbitration.

**SO ORDERED**, this   9th   day of June, 2011.

_____
RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

13